**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KING SYKES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 23-cv-1636 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| THE CITY OF CHICAGO; SOPHIA | ) | |
| KING, in her official capacity as | ) | |
| Alderwoman for the 4th Ward of the | ) | |
| City of Chicago; SCOTT GOODMAN; | ) | |
| GRIT CHICAGO LLC, and FARPOINT | ) | |
| DEVELOPMENT LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

King Sykes LLC, the plaintiff in this matter, owns a parcel of land in Chicago's Bronzeville neighborhood. Defendants City of Chicago and former Alderwoman Sophia King (together, the City Defendants), in conjunction with defendant real estate developer Scott Goodman and two defendant development companies named GRIT Chicago LLC and Farpoint Development LLC (collectively, the Developer Defendants), planned to redevelop the broader area in which King Sykes' plot is situated. In its amended complaint, ECF No. 39, King Sykes accuses the defendants of scheming to deny it the full fair-market value of its property so that they can acquire it for a lesser amount for their own redevelopment purposes later on. Based on that claim, King Sykes seeks to hold each of the defendants liable for violating and/or conspiring to violate its constitutional rights. It separately seeks to hold each of the Developer Defendants liable for tortiously interfering with an agreement that King Sykes had to sell the plot of land to a third party named Equinix, LLC. The City of Chicago, Goodman and Farpoint, and GRIT have filed three

motions to dismiss the complaint on various grounds, including ripeness and failure to state a claim.[1] For the reasons that follow, the City's motion to dismiss is granted, Goodman and Farpoint's motion to dismiss is granted in part and denied in part, and GRIT's motion to dismiss is granted in part and denied in part.

## FACTUAL BACKGROUND[2]

The plot that King Sykes owns, and which is at the heart of the events giving rise to its complaint,[3] is an approximately 6.6-acre parcel of land located at 2545-55 South King Drive in the Bronzeville neighborhood of Chicago (the "KS site"). It is the largest parcel of a broader 11-acre plot of land referred to in the complaint and elsewhere as the "Advocate/McDonalds" or "Advocate" site. The Advocate site is bounded by 25th Street to the north,[4] King Drive to the west, 26th Street to the south, and train tracks to the east. The KS site occupies the southern portion of the Advocate site. King Sykes has owned the KS site, which is in Chicago's 4th ward, since 2007.

The tracks to the east abut a marshalling yard ("Marshalling Yard" or "Yard") owned by the Metropolitan Pier and Exposition Authority ("MPEA"). MPEA is a joint City-State agency. Its board members and CEO are appointed by the mayor and the governor. The MPEA uses the Yard as a staging area for trucks and other vehicles servicing the nearby McCormick Place Convention Center.

---

[1] Maurice Cox and Samir Mayekar were named as defendants in the original complaint but were dropped from the amended complaint. Accordingly, the Clerk will be directed to reflect that they were terminated as parties on July 20, 2023.

[2] The following facts are undisputed unless otherwise noted.

[3] References to the "complaint" are to the operative, amended complaint, ECF No. 39.

[4] Beyond 25th Street to the north is the Stevenson Expressway, which reaches its terminus close by, as it feeds into DuSable Lake Shore Drive. Just north of the Stevenson Expressway is the McCormick Place Convention Center. A "Context Map" of the area is included as Exhibit 1 to the amended complaint, ECF No. 39.

**A.     The City's Plans to Redevelop the Area Surrounding the KS Site**

South of the Advocate site, across 26th Street, is a large plot of land known as the "Michael Reese site." The City acquired it in 2009 after the closing of the Michael Reese Hospital. King Sykes' complaint alleges that in 2016, the City of Chicago, in collaboration with the MPEA, solicited proposals from developers for the purchase and redevelopment of the Michael Reese site. The complaint notes that the request for proposal (RFP) repeatedly highlighted the potential roles that the Advocate site and Marshalling Yard could play in the redevelopment of the area. The RFP anticipated that the City might eventually resort to eminent domain to acquire the Advocate site in the event that private negotiations by the "Selected Developer" of the Michael Reese site failed, stating:

> If the Selected Developer has included the Advocate Site in their Development Proposal, the Selected Developer must commit to acquire the Advocate Site through private negotiations with the current owners. However, if private negotiations fail and the City elects, in its own discretion, to acquire the property through eminent domain, then the developer must commit to pay the fair market value of the land as determined by a court, plus the City's acquisition costs.

Am. Compl. ¶ 20.

After reviewing various proposals, the City eventually selected development company GRIT Chicago, LLC and its proposal for the Michael Reese site—which did not include any proposal as to the KS site. According to the complaint, GRIT is managed by Farpoint Development LLC, which is in turn managed by developer Scott Goodman. King Sykes alleges that Goodman controls both GRIT and Farpoint.[5]

---

[5] The Developer Defendants dispute this claim, and argue that the complaint fails to distinguish between them. It is unnecessary to resolve this dispute in light of the dismissal on other grounds, but the dispute highlights an issue that King Sykes should not ignore should it opt to replead.

The City and GRIT executed an agreement providing for GRIT's purchase of the Michael Reese site in periodic installments. The agreement further provided that the total amount GRIT would pay to the City depended, in part, on the financial success of the redevelopment project. King Sykes' complaint notes that as a result, the City's and GRIT's financial interests with respect to the Michael Reese site became aligned.

After GRIT won the Michael Reese site RFP process, it began negotiations with the MPEA to purchase the Marshalling Yard. Those negotiations were successful. GRIT and MPEA executed of a letter of interest (LOI), which provided GRIT with the right to develop the Marshalling Yard site—through the construction of "high-end, mixed use improvements"—but only after GRIT acquired the Advocate site and constructed a logistics center there. The Advocate site was necessary because the MPEA needed a suitable location to continue executing logistical operations for the McCormick Center, operations for which it would otherwise be using the Marshalling Yard. Am. Compl. ¶ 28. The LOI also obligated the MPEA to "cooperate, as reasonable, with [GRIT's] efforts to acquire fee simple ownership of" the Advocate site. *Id.* In light of these circumstances, King Sykes alleges, its KS site, the largest parcel of the broader Advocate site, became extremely valuable to GRIT (and by extension, to Farpoint and Goodman) and the City.

In late August 2018, GRIT, through Goodman, made King Sykes aware of its intention to eventually acquire the KS site. Goodman allegedly told King Sykes that "he might 'need' the KS Site to build a logistics center for MPEA[,] that he and his 'friends' in City government would oppose any use that Plaintiff might propose for that property until the time that Goodman decided he needed it[, and] that Plaintiff would never get zoning approval for any use of the property in the meantime." Am. Compl. ¶ 30. According to King Sykes, this amounted to a threat by Goodman that the Developer Defendants and the City "would prevent Plaintiff from selling or developing

the KS Site because they wanted to buy it at an artificially low price in the distant future as part of their plans for all three sites – the Michael Reese Site, the MPEA Site, and the Advocate Site (including the KS Site) that is contiguous to both of them." *Id.* ¶ 31. King Sykes alleges that, to accomplish this, Alderwoman Sophia King, the City Council representative for the 4th ward—in which all of the relevant plots of land lie—would use her "aldermanic privilege" to veto any proposed zoning changes to the KS site that would facilitate any future sales or developments of the property by King Sykes.

### B.    King Sykes' Attempted Sale of the KS Site

In 2020, King Sykes began entertaining offers from potential buyers of the KS site. One potential buyer was Equinix, LLC, a digital infrastructure company. It proposed to build a data center on the site. King Sykes alleges that around the same time (July 2020), Scott Goodman, through his company GRIT Acquisitions LLC, which was managed by GRIT Chicago, offered to purchase the KS site for more than $28.5 million. GRIT Acquisition's cover email to its proposal stated, "Based on the aforementioned combined with our relationships in the community and investments in the area, we believe that we provide the seller with the best outcome and highest certainty to close." Am. Compl. ¶ 36.

King Sykes ultimately declined GRIT Acquisition's offer. Instead, it entered into agreement with Equinix for sale of the KS site for $30 million. The sale was contingent on Equinix obtaining the required government approvals, including any necessary "licenses, planned development approvals, zoning changes, [and] site plan approvals." Am. Compl. ¶ 38. The most crucial development approval was for construction of a data center.

In September 2020, Equinix made a pre-application proposal and followed up with related submissions to city agencies and officials, and to Alderwoman King, describing Equinix's plans to construct a data center on the site and detailing its planned investment of $300 million to develop

the site. According to King Sykes, Alderwoman King responded to these submissions with overt hostility that prompted commentary by various city officials expressing disbelief concerning King's opposition and flagging it as a "good example of [Aldermanic] privilege."

The complaint alleges that after King Sykes rejected GRIT's offer in favor of Equinix's, Alderwoman King, Goodman, and the City began a campaign intended to frustrate the King-Sykes-Equinix deal. Not only did they succeed in undermining the deal, it alleges, but they also allegedly succeeded in redirecting Equinix toward buying the Michael Reese site and building its data center there, instead of the KS site.

This alleged campaign to thwart the sale to Equinix began with Goodman's efforts to ensure that the KS site was included on the City's property acquisition list. In August 2020, Goodman—allegedly acting on behalf of GRIT and/or Farpoint—emailed Alderwoman King and the Deputy Mayor of Chicago, Samir Mayekar, after he learned that King Sykes had declined his offer in favor of Equinix's, stating:

> In order to fully execute on the Michael Reese/Marshaling Yards plan, we need to provide a new Logistics Center to replace the Marshaling yard staging facility. The attached maps show the parcels we will need to acquire to accomplish this. We formally request that these parcels be designated on the City's Property Acquisition list, as is allowed for under the TIF Act.

Am. Compl. ¶ 39. By "these parcels," Goodman was allegedly referring to the Advocate site, which, again, included the KS site.

Next, Goodman, King, and other City officials allegedly worked to convince Equinix to build its planned data center at the Michael Reese site, which was owned by GRIT and was located just across the street from the KS site. The complaint details several pitches that Goodman made to the initially hesitant Equinix (which preferred the KS site for a variety of reasons). In one, for example, it alleges that Goodman "referred to the fact that the Developer Defendants and

Alderwoman King were blocking the Equinix-[King Sykes] deal – and that, in contrast, an Equinix-GRIT deal would have 'Complete City support' and even 'potential expedited permitted [sic].'" Am. Compl. ¶ 47.

In early 2021, Alderwoman King allegedly denied Equinix's pre-application submissions to the City, which depicted the proposed data center and the substantial investment Equinix was prepared to make. She was adamantly opposed to the development of Equinix's data center on the KS site and supported building one at the Michael Reese site instead. Eventually, after further communications and during a telephone call with Equinix and Goodman, Alderwoman King stated that the City would "not grant Equinix the required approvals because the City wanted to purchase the KS Site, and to purchase it 'cheap.'" Am. Compl. ¶ 56. According to the complaint, "Alderwoman King wanted only one data center in the area – the one she and the Developer Defendants had suggested for the Michael Reese Site." *Id.* King Sykes alleges that, by March 2021, Alderwoman King had made it definitively clear to Equinix that she would deploy her aldermanic privilege to block any approval for Equinix's proposed data center, or anything else on the KS site. King allegedly explained her stance by saying, "we have plans for the King Sykes site." Am. Compl. ¶ 60.

As a result, the complaint alleges, the Equinix-King-Sykes deal never closed; Equinix sent King Sykes a termination letter in April 2021 before entering into negotiations with Goodman to purchase land at the Michael Reese site and build a data center there. The City Council adopted the Michael Reese Planned Development plan, expressly permitting the site to include one—but not more than one—electronic data storage center.

In June 2022, Alderwoman King's chief of staff told a representative of King Sykes over the phone that "the City/King would not support development of the KS Site, which would remain 'amorphic' until the City decided what its plans were for the site." Am. Compl. ¶ 67.

## ANALYSIS

King Sykes seeks to hold the defendants liable for obstructing its deal with Equinix, rendering the KS site unmarketable, and denying King Sykes all economically beneficial or productive use of the KS site without compensation. It seeks relief against the following defendants on the following grounds: the City under 42 U.S. Code § 1983 for deprivation of its rights under the Fifth Amendment's Takings and Just Compensation Clause (Count I); Alderwoman King and the City under § 1983 for violation of its equal protection rights (Count II); Alderwoman King, the City, GRIT, and Farpoint under § 1983 for conspiring to violate its equal protection rights (Count III); and against GRIT Chicago, Farpoint, and Goodman separately for tortious interference with prospective economic opportunity under Illinois law (Counts IV-VI).

The defendants have filed three separate motions to dismiss the amended complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). ECF No. 42 (filed by GRIT); ECF No. 45 (the City and Alderwoman King); ECF No. 47 (Goodman and Farpoint). The City Defendants, Goodman, and Farpoint also seek dismissal of King Sykes' constitutional claims under Rule 12(b)(1) for lack of subject matter jurisdiction due to lack of ripeness.[6] The existence of subject matter jurisdiction is a threshold question that the Court must address before addressing the merits of King Sykes' claims.

---

[6] The ripeness of the asserted case or controversy is an essential component of subject matter jurisdiction. *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019).

I.      **Ripeness of King Sykes' Constitutional Challenges**

In deciding a motion to dismiss for lack of subject matter jurisdiction, the "court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). It "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue." *Id.*

The "[r]ipeness doctrine is based on the Constitution's case-or-controversy requirements as well as discretionary prudential considerations." *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011); U.S. Const. Art. III. It is "designed to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'" *Natl. Park Hosp. Ass'n v. Dept. of Int.*, 538 U.S. 803, 808 (2003) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-49 (1967)).

With respect to the application of the doctrine to a constitutional dispute concerning land, *e.g.*, a challenge under the Takings Clause, the Supreme Court has warned that "a federal court should not consider the claim before the government has reached a 'final' decision." *Pakdel v. City and Cnty. of San Francisco, California*, 141 S. Ct. 2226 (2021) (quoting *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 737 (1997)).[7] To qualify as a "final decision," the regulatory action must be both definite, meaning that it reflects a clear-cut determination as to how the

---

[7] Meeting this finality requirement is sufficient to show that a takings claim is ripe. *Willan v. Dane Cnty.*, No. 21-1617, 2021 WL 4269922, at *2 (7th Cir. Sept. 20, 2021) (noting that the Supreme Court, in *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019), dispensed with a second requirement for ripeness of takings claims—that a landowner must have sought just compensation through available state procedures before resorting to court—leaving only the finality requirement in place). The now-defunct requirement of exhausting state procedures for obtaining just compensation ***after*** a taking occurs should not be confused with the requirement of obtaining a final decision on a proposed development, the prerequisite for a ripe taking that remains intact after *Knick*.

regulation applies to the property, and definitive, in that it reflects the government's final say on the matter. *See Unity Ventures v. Lake Cnty.*, 841 F.2d 770, 774 (7th Cir. 1988) ("[C]ourts should not decide the impact of regulation until the full extent of the regulation has been finally fixed and the harm caused by it is measurable." (quoting *Herrington v. Sonoma Cnty.*, 834 F.2d 1488, 1494 (9th Cir. 1987))).[8] The former component requires that the plaintiff show that the government actually had the opportunity to reach an official decision that has resulted in discernible ramifications for the property. As the Supreme Court has explained, "because a plaintiff who asserts a regulatory taking must prove that the government 'regulation has gone too far,' the court must first 'kno[w] how far the regulation goes.'" *Pakdel*, 141 S. Ct. at 2230 (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986)) (alteration in original). With regard to the latter finality component, a plaintiff must adequately allege that the government has "committed to a position," in that it is not subject to change. *Id.* at 2230. That is, "a plaintiff's failure to properly pursue administrative procedures may render a claim unripe *if* avenues still remain for the government to clarify or change its decision." *Id.* at 2231 (emphasis in original).

The twin aspects of the final-decision requirement—definite and definitive—have important implications where, as here, a plaintiff challenges a land-use decision as unconstitutional. The Seventh Circuit has firmly held that in such land-use challenges, "[a] final decision must be demonstrated by a development plan submitted, considered, and rejected by the governmental entity." *Unity Ventures*, 841 F.2d at 775; *Willan v. Dane Cnty.*, No. 21-1617, 2021 WL 4269922 (7th Cir. Sept. 20, 2021) ("[A] property owner should 'at least resort to the procedure for obtaining variances and obtain a conclusive determination by the Commission whether it would

---

[8] The *Unity* "plaintiffs' suit [was] not premised on a takings claim," but, the Seventh Circuit held, "the ripeness analysis used in [takings] cases applies as well to equal protection and due process claims," which the *Unity* plaintiffs were pursuing. *Id.* at 775.

allow the proposed development, in order to ripen [his] takings claim.'" (*quoting Suitum*, 520 U.S. at 737)). The Supreme Court has elaborated on the underpinnings and nature of this "general rule":

> [A] landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation. Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law. As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established. Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision.

*Palazzolo v. Rhode Island*, 533 U.S. 606, 620-21 (2001) (citation omitted). Accordingly, courts have frequently dismissed land-use challenges as unripe where plaintiffs did not first submit applications describing their development proposals and receive decisive rejections of their proposed developments before suing in court. *See, e.g.*, *Erickson v. Village of Yorkville*, No. 21-CV-544-SCD, 2023 WL 4489512, at *6-7 (E.D. Wis. July 11, 2023); *Akmakjian v. Village of Hoffman Estates*, No. 22 C 04023, 2023 WL 2242006, at *2-3 (N.D. Ill. Feb. 27, 2023).

      In this case, the defendants argue that King Sykes failed to follow any such procedures and its claims should therefore be dismissed as unripe. King Sykes concedes that neither it nor Equinix ever filed a formal application with respect to the data center proposal or any other development for the KS site, let alone received any rejections on any such formal applications or followed any procedures to obtain any conclusive rejections. *See* Plt. Resp., ECF No. 55, at 8 (acknowledging that King Sykes "submitted a pre-application and engaged in discussions with the City and King"). Nonetheless, it asserts that the City and Alderwoman King's rejection of Equinix's informal "pre-

application" data center submissions and the Alderwoman's insistence that the land would not be approved for future developments were sufficient to ripen the dispute.

According to King Sykes, Alderwoman King's ability to exercise her aldermanic privilege—virtually unchecked veto power over land-use decisions in her ward—after making her unequivocal rejection to Equinix, as well as her forecast about future development proposals to King Sykes, rendered any follow-up application processes obviously futile. In other words, the specter of her using her veto was equivalent to an actual veto for finality purposes. King Sykes is correct that a demonstration of futility may allow a plaintiff to bypass the typical showing required for finality, *i.e.*, exhausting all avenues for reconsideration or alternative means of approval. The Seventh Circuit has recognized that the finality requirement may be satisfied where the plaintiff can provide "proof that attempts to comply [with such procedures] would be futile." *Unity Ventures*, 841 at 775 (citing *Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1454 (9th Cir. 1987); *Martino v. Santa Clara Valley Water Dist.*, 703 F.2d 1141, 1146 n.2 (9th Cir. 1983)).

In response, however, the defendants assert that plaintiffs can only resort to the futility argument ***after*** they've initiated the application process. In other words, the futility exception can excuse exhaustion (by showing that the City's position was practically final), but it cannot excuse failure even to initiate the application process (to show that the City had officially adopted the decision and thus affected the property). Courts tend to hold plaintiffs to this one-application minimum no matter how strongly they assert futility at the outset. *See, e.g.*, *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 603 (S.D.N.Y. 2013) ("[T]here is no such thing as a futility exception to the requirement that a landowner make at least one formal application before bringing the type of as-applied challenges brought by Plaintiffs here.") (collecting cases), *aff'd sub nom. Congregation Rabbinical College of Tartikov,*

*Inc. v. Village of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019); *Long Grove Country Club Estates, Inc. v. Village of Long Grove*, 693 F. Supp. 640 (N.D. Ill. 1988) ("The final decision requirement can be met with proof that attempts to comply would be futile. A developer's mere allegation that he has done everything possible to obtain acceptance of a development proposal does not prove futility. At a minimum, the developer must show that he made at least one meaningful application for a development permit." (internal citations omitted)).

The complaint essentially attributes *two* decisions to the City Defendants, and, even though they are lumped together throughout the complaint and briefing, they actually merit separate ripeness analyses. First, there is Alderwoman King's rejection of Equinix's proposed data center on the KS site on behalf of the City. Second, there is Alderwoman King's insistence that the City would not grant King Sykes any future development permits for the KS site. As discussed below, only the former represents a final decision for ripeness purposes. The latter is simply too speculative and falls too far outside the contours of acceptably ripe land-use challenges as circumscribed by the case law.

### A.    The Rejection of Equinix's Proposed Data Center

To the extent that King Sykes' taking theory is premised on the City and Alderwoman's rejection of the Equinix data center proposal, it raises a ripe issue. King Sykes' allegations about the nature of Equinix's pre-application proposals and the rejection of them by Alderwoman King and the City Council adequately establish that King and the City reached a conclusive determination about a concrete proposal that had clear ramifications for the KS site.  Once the City amended the Chicago Zoning Ordinance to adopt the Michael Reese Planned Development, which permitted a data center on the Michael Reese site, it was "committed to a position"—namely, that a data center on the KS site would not be approved.

13

The Court is not persuaded by the City Defendants' argument that this particular aspect of King Sykes' claim is unripe because "it did not follow the procedures to apply for a zoning change and obtain a conclusive determination on that request." Reply at 2, ECF No. 61. The denial qualifies as a sufficiently final decision for ripeness purposes even though neither Equinix nor King Sykes pursued a "formal" application under the City's procedures. Cases like *Unity Ventures* do not, by their own facts, strictly require the submission of at least one formal application in all circumstances; rather, they reinforce "a general rule . . . . Ripeness doctrine does not require a landowner to submit applications for their own sake." *Palazzolo*, 533 U.S. at 621-22. In *Unity Ventures*, the Seventh Circuit rejected the plaintiffs' claims as unripe due to the lack of a decision on a completed application for a sewer connection, but it did so at least in part because there was not a sufficiently firm basis to infer that it would not have eventually been approved. 841 F.2d at 774-76. The Village's mayor, who rejected the plaintiffs' request, explicitly left the door open for future approval; he even said that "[a]s a matter of record [the defendant Village] has never taken the position that it will never consent to the connection by" the plaintiffs later. *Id.* at 775. Such an application could have, for instance, addressed the capacity concerns that ostensibly influenced the Village and mayor's initial disapproval and thereby resulted in an eventual approval of the sewer connection the plaintiff was seeking. *Id.* at 776. And if the Village nevertheless were to deny a formal application addressing those concerns, then that process would have furnished a reviewing court with "a basis on which to evaluate the impact and extent of the Village's denial." *Id.*

Here, on the other hand, the complaint adequately alleges that Alderwoman King's rejection of Equinix's proposed data center, made upon consideration of its pre-application submissions, and the City Council's subsequent approval of the Michael Reese Development Plan,

which facilitated the relocation of Equinix's data center to the Michael Reese site, was sufficiently final. As it is alleged in the complaint, Alderwoman King was far less equivocal than the mayor in *Unity Ventures*; although it was "simply impossible" to know how the government in *Unity Ventures* would have acted on the requested connection at issue there, *id.*, it is reasonably certain (assuming the truth of the allegations in the complaint) that Equinix's proposed data center on the KS site would not have been approved by the City Council had such an application ever been formally presented.

This is not just a matter of the firmness of the decisionmaker's tone when communicating the rejection. Perhaps the most significant allegation in this case is that the City's broader redevelopment plans for the area reflect a commitment to having a data center located on a site other than the KS site. Moreover, the complaint's allegations surrounding GRIT's LOI with the City/MPEA regarding the Marshalling Yard raise a strong inference that the City would not permit Equinix to build a data center just to have it taken down once GRIT and the City need the KS site as a replacement location for the McCormick Center staging operations that would otherwise take place at the Marshalling Yard. These are strong indicators that Alderwoman King's rejection reflected not just her own but the City's firm stance on the issue.

This ruling is consonant with the other cases requiring submissions of land-use applications to ripen takings or other constitutional claims. Equinix's pre-application submission and development plans and the City's rejections are not meaningfully different from the formal applications and official rejections required in other cases; they still serve the prudential purposes of the final-decision requirement, in that the following are clear from the submissions and rejection: (i) the land use that Equinix was proposing for the KS site—permission to construct a data center—and (ii) the ramifications of the rejection of their proposal—neither Equinix nor King

Sykes nor any other buyer will be able to construct a data center on the site. *See Palazzolo*, 533 U.S. at 621 ("In assessing the significance of petitioner's failure to submit applications to develop [his property] it is important to bear in mind the purpose that the final decision requirement serves. Our ripeness jurisprudence imposes obligations on landowners because '[a] court cannot determine whether a regulation goes "too far" unless it knows how far the regulation goes.' *MacDonald,* 477 U.S., at 348, 106. Ripeness doctrine does not require a landowner to submit applications for their own sake. Petitioner is required to explore development opportunities on his [property] only if there is uncertainty as to the land's permitted use.").

**B.      The Prohibition on Any Future Redevelopment of the KS Site**

The dispute is unripe, however, insofar as King Sykes alleges that an uncompensated regulatory taking or other constitutional violation occurred when Alderwoman King asserted that the City would block any future development proposals on the KS site (except for those that City and Developer Defendants were planning). King Sykes has failed to demonstrate that this statement qualified as a final decision.

To establish finality, King Sykes tries to rely on an individual official's statement that a land-use application would never be approved, based in part on the discretionary veto power that the official held as a matter of tradition.[9] The flip side of that position—and a reason why it is particularly helpful to rely on official rejections of concrete development proposals to establish ripeness and injury—is that Alderwoman King is no longer in office, a fact that the Court takes under judicial notice. *See Krupa v. Quinn*, 596 F. Supp. 3d 1127, 1134 n.2 (N.D. Ill. 2022)

---

[9] The parties debate the extent to which "aldermanic privilege" is a real phenomenon. It is not necessary for the Court to weigh in on this issue—or whether it is an issue appropriate for adjudication on a motion to dismiss—given that the claim fails even if the Court adopts King Sykes' position that it is an established phenomenon.

(explaining that aldermanic election results are proper subject of judicial notice and collecting cases).[10] Not only has the City not yet had the opportunity to reject any proposed KS site developments (except for the data center), but the person whose statements on which the plaintiff relies to forecast the outcomes of future proposals no longer has the authority to influence those outcomes. Thus, "avenues still remain for [the City and the successor to Alderwoman King] to clarify or change its decision." *Pakdel*, 141 S. Ct. at 2231. Given that King Sykes' contention is that Alderwoman King's statement that the KS site would ***never*** be approved for development constituted a sufficiently final decision, then it needs—but fails—to adequately confront the fact that the Alderwoman was not in a position to follow through on that statement. This is precisely why the formal application requirement makes sense: there needs to be an official governmental action to scrutinize—not merely an informal declaration about future governmental action, because those informal forecasts may not always be dependable. In a sense, the dispute is both unripe, because the City has not yet achieved a final decision on a meaningfully concrete proposal, and moot, because, to the extent that Alderwoman King expressed a firm commitment to a position on the KS site, that expression no longer carries weight. Either way, it is not justiciable.

Given the lack of any concrete proposals surrounding potential developments on the KS site (other than Equinix's data center proposal), and, consequently, the lack of any rejections or decisions about them, the Court is not in a position to evaluate the nature of the burden imposed on the KS site. "While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings

---

[10] The City's website indicates that Lamont J. Robinson is currently the Alderman for Ward 4. City of Chicago, Ward 4, https://www.chicago.gov/city/en/about/wards/04.html (last visited Feb. 22, 2024).

claim is likely to have ripened." *Palazzolo*, 533 U.S. at 620. Here, there is no degree of certainty as to the permissible uses of the KS site—an issue that bleeds into the merits-plausibility analysis but is still relevant here. The Equinix data center rejection raised a ripe issue in large part because the allegations surrounding the City's broader redevelopment plans for the area made clear that the City was committed to one and only one data center being developed on the Michael Reese site, not the KS site. Here, there is no sufficiently broader assurance—besides Alderwoman King's flimsy word—that the City is absolutely committed to blocking future developments on the KS site until the Developer Defendants take it over. It is not certain, for example, that the City would deny King Sykes the opportunity to use the land in a temporary-though-economically-productive manner until the time comes for GRIT and/or the City to acquire it. Given these uncertainties, there is no flexibility under the case law with respect to the necessity of demonstrating some sort of rejection other than the hyper-specific data center decision. *See Willan*, 2021 WL 4269922, at *2-3. The prudential purpose that requirement serves is too great to be overcome by King Sykes' allegations here.

For these reasons, to the extent that King Sykes claims that this alleged blanket prohibition constitutes a taking, that claim is dismissed as unripe. It is an abstract, premature disagreement over a hypothetical harm—precisely the type of web in which the Supreme Court and Seventh Circuit have warned district courts not to find themselves entangled. And as discussed below, even assuming *arguendo* that it was a final decision, it is not one that constitutes a plausible regulatory taking or equal protection violation on the merits.

## II. Plausibility of King Sykes' Constitutional Claims

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff's complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads

18

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up).

King Sykes asserts that the City violated its right to just compensation under the Fifth Amendment's Takings and Just Compensation Clause, as incorporated against the states through the Fourteenth Amendment, that the City Defendants violated its rights as a class-of-one under the Fourteenth Amendment's Equal Protection Clause, and that the City Defendants, GRIT, and Farpoint should be held liable for conspiring to violate its equal protection rights as a class-of-one. In applying the analytical frameworks that govern these two provisions, the Court concludes that King Sykes has failed to state a plausible constitutional violation under either theory. Since the Court's conclusion that the complaint raises a ripe dispute only insofar as it challenges the City Defendants' rejection of Equinix's data center, the Court's focus will be on that decision. But it bears noting that the same shortcomings would still doom King Sykes' claim even if it were based on Alderwoman King's alleged blanket bar on any future developments at the KS site.

### A.    Takings Clause

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.' The Clause is made applicable to the States through the Fourteenth Amendment." *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017). In a traditional takings case, the plaintiff accuses the government of "a direct appropriation of property . . . or the functional equivalent of a practical ouster of the owner's possession," *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014, (1992) (cleaned up). Courts have also identified as

19

categorical takings requiring just compensation scenarios where governmental "regulation[s] den[y] all economically beneficial or productive use of land." *Id.* at 1015. To qualify as such a categorical taking, "the measure must place such onerous restrictions on land as to render it useless." *Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 421 (7th Cir. 2010). Finally, where there is neither a direct appropriation nor a regulation that "impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on 'a complex of factors,'" set out in *Penn Cent. Transp. Co. v. City of N.Y.,* 438 U.S. 104 (1978), and discussed below. *Murr*, 582 U.S. at 393. The Court refers to this third option as a *de facto* regulatory taking.

The City and Alderwoman King didn't approve Equinix's request to build a data center on the KS site. That was an adverse decision for King Sykes' bottom line because the sale to Equinix didn't go through. But not all governmental decisions affecting property—even those that unambiguously devalue a plaintiff's land—constitute takings. *See Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) ("[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking."). And to allege having been denied one use, or even multiple uses, is not itself sufficient to show total economic loss, which is a prerequisite for claiming a categorical, non-physical taking. *See Dyson v. City of Calumet City*, 306 F. Supp. 3d 1028, 1045 (N.D. Ill. 2018) ("[The complaint] states only that the defendants have denied (or at least effectively denied) two of Dyson's proposed uses for the property: a banquet hall and a youth venue. But it does not follow from these allegations that Dyson is unable to use the property for *any* economically beneficial purpose; that the defendants have denied two uses does not mean that the property is now useless." (emphasis in original)).

20

To survive the defendants' motions to dismiss, then, King Sykes must plausibly allege a *de facto* regulatory taking. To assess whether it has done so, the Court must consider the factors laid out in *Penn Central*: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 582 U.S. at 393 (citing *Palazzolo*, 533 U.S. at 617, and *Penn Central*, 438 U.S. at 124).

The Court notes at the outset of the plausibility evaluation that King Sykes' complaint tells a familiar story. It is a fact of urban life that renewal and redevelopment projects may prove advantageous for some groups while leaving others feeling aggrieved. *See Anjum v. City of Chicago*, No. 1:21-CV-00205, 2022 WL 874623, at *1 (N.D. Ill. Mar. 24, 2022) ("Sometimes a community's vision for a neighborhood clashes with the vision of building owners for their specific properties."). Those who are aggrieved, like King Sykes, often seek remedies in federal courts, but only on rare occasions will they find succor in the U.S. Constitution. *See CEnergy-Glenmore Wind Farm No. 1, LLC v. Town of Glenmore*, 769 F.3d 485, 488 (7th Cir. 2014) ("We note at the outset, however, that federal courts, as we have explained time and again, are not zoning boards of appeal. State and local land-use decisions are entitled to great deference when constitutional claims are raised in federal court." (citations omitted)). Ultimately, after taking stock of King Sykes' well-pleaded allegations and assessing them using the *Penn Central* factors, the Court concludes that the blocking of Equinix's proposed data center does not amount to a regulatory taking. Even assuming *arguendo* that Alderwoman King's other alleged statement—that King Sykes would never receive approval to develop its KS site for any other purpose—were a final decision giving rise to a ripe issue, that claim would fall short of plausibly establishing a regulatory taking as well.

### 1.  Economic Impact

King Sykes has failed to sufficiently allege the economic impact of the City's actions with respect to the KS site. It has asserted only bare conclusions that the City's actions "ha[ve] rendered the KS Site unsaleable to any other buyer and ha[ve] denied Plaintiff all economically beneficial or productive use of its property." Am. Compl. ¶ 86. To state a plausible regulatory claim, King Sykes needed to allege specific facts underpinning these conclusions, but it failed to do so.

In *Nowlin v. Pritzker*, 34 F.4th 629 (7th Cir. 2022), the plaintiffs alleged that certain COVID-19 restrictions on non-essential business deprived them of "their preferred or most profitable uses" of their property, but the Seventh Circuit concluded that the closure orders did not "effect[] a regulatory taking." *Id.* at 635. One primary justification was that the plaintiffs did not allege sufficient facts to plausibly claim a "total or near-total deprivation of use or value" of their land. *Id.*; *see also, Penn Central*, 438 at 125 ("Zoning laws . . . have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property."). The plaintiffs did, to be sure, state in their complaint that the regulations "deprived [the] Businesses . . . of all economically beneficial use of their property," but those were merely thinly veiled legal conclusions that are not entitled to deference at the pleading stage. *Nowlin*, 34 F.4th at 634-35. The Seventh Circuit explained:

> [The plaintiffs] have not supported those conclusions with factual allegations that plausibly suggest that the Governor's orders constituted regulatory takings. How much money did they lose? How long was each Business closed? Did one or more of them use its property in other, albeit less lucrative, ways? We don't know.

*Id.*

Here, too, there remain too many unknowns. King Sykes has only alleged that the City prohibited King Sykes' preferred use of its land—selling it to Equinix after obtaining approval for eventual construction of a data center. What other economically beneficial uses for the KS site

might the City approve or wish to pursue? What is the value of the land in light of that rejection? As the City points out, King Sykes' own allegations belie the notion that the land has lost a significant amount of value as a result of the City's decision; King Sykes turned down GRIT's $28.5mm offer for the land, which was not predicated on first obtaining any zoning approvals. Reply at 7, ECF No. 61. Therefore, at worst, even if it were true that the City will block any redevelopment plans at the site, King Sykes' own complaint does not go further than alleging a loss of value of around 6-7%.

It strains logic even to say that the KS site "lost value" as a result of the City Defendants' decision when measuring the site's value against the status quo ante. Any alleged decision in this case would be most aptly characterized as a refusal to upzone, *i.e.*, expand the property's potential development uses, based on a comprehensive redevelopment plan that the City and developers had already put into motion.[11] In other words, King Sykes is really alleging that the City Defendants refused to give it (or Equinix) what it needed to derive more value from the KS site. King Sykes had owned the KS site for years before the City sought proposals for the redevelopment of the Michael Reese site, but it has alleged no facts that plausibly suggest that it had a property interest in the possible future appreciation of the KS site that future zoning changes might yield. Nor has it cited any authority for the proposition that declining to upzone constitutes a taking under the Fifth Amendment.

---

[11] "'Upzoning' refers to a rezoning or reclassification to a more intensive use category—usually one that is more profitable to the landowner." Upzoning and downzoning—Upzoning amendments, 3 Rathkopf's The Law of Zoning and Planning § 38:12 (4th ed.).

### 2. Investment-Backed Expectations and Character of Government Action

Relatedly, the Court is not persuaded that the City Defendants undercut King Sykes' investment-backed expectations or that the decision was of an onerous nature. As just discussed, by rejecting Equinix's data center proposal, the City merely preserved the status quo ante. No greater restrictions have been imposed on the land than those that were in place prior to the City's redevelopment program began. Courts often decline to find takings even where localities make land-use decisions that introduce new encumbrances on properties, *e.g.*, "downzoning" changes. This is because "the character of the government action is the exercise of a municipality's heartland authority to decide zoning classifications," and plaintiffs face obstacles in plausibly alleging that such decisions actually clashed with their investment-backed expectations because land-use regulation changes are not out of the ordinary. *Anjum*, 2022 WL 874623, at *8; *Nowlin*, 34 F.4th at 634-35. Here, because the City decided not to change anything at all, it has an *a fortiori* case for the propriety of its actions. And King Sykes fails to allege facts suggesting its investment-backed expectations included receiving permits to develop the KS site—a difficult burden given that property owners are not entitled to favorable land-use regulatory changes. *Cf. Lapkus Builders, Inc. v. City of Chicago*, 196 N.E.2d 682, 686 (Ill. 1964) ("While the price of the property purchased by plaintiff was concededly greater than its value for the uses permitted by the ordinance, this fact has little, if any, significance under the circumstances here present. . . . Purchasers who acquire property with the expectation of using it for a purpose not permissible under current zoning restrictions should not expect loss resulting from denial of the proposed use to be a persuasive argument in securing the change."); *see also Home Builders Assn. of Greater Chicago v. City of Chicago*, 213 F. Supp. 3d 1019, 1032 (N.D. Ill. 2016) ("Just as a property owner must consider the possibility of future regulations, or a taxpayer must consider the possibility of property tax

changes, so Hoyne cannot rely only [on] what it actually anticipated when the City has the discretion it exercised here. . . . In the case before this court, the City did not even adopt a new regulation, but instead applied an existing regulation to Hoyne. Finally, as the City observes, Hoyne had no reasonable expectation of developing fourteen market-rate units because Hoyne never possessed that right in the first place.").

King Sykes' underlying supposition is that the City aimed to prevent development at the KS site as a means of artificially depressing the value of the KS site until such time that GRIT completes a private acquisition of it or, if negotiations fail, the City obtains it via eminent domain. That theory of the City's motives does not move the needle in King Sykes' favor. The mechanics of the Takings and Just Compensation Clause, as well as basic economic principles, will promote the appropriate outcome.

King Sykes can choose to negotiate with GRIT over what it considers a fair price for the property—indeed, it can try to charge whatever it wants. But if those negotiations fail, then the City will presumably need to acquire the site via eminent domain, as King Sykes itself alleges. Then, King Sykes would be entitled to just compensation, which "means the full monetary equivalent of the property taken. The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Almota Farmers Elevator & Warehouse Co. v. U.S.*, 409 U.S. 470, 473-74 (1973).

At that time, "[t]he Government must pay just compensation for those interests probably within the scope of the project ***from the time the Government was committed to it***." *Id.* at 477-78 (cleaned up) (emphasis added). Importantly, King Sykes should rest assured that, in calculating that amount, "[the City] may not take advantage of any depreciation in the property taken that is attributable to the project itself." *Id.* at 478.

Conversely, however, in calculating the fair market value, King Sykes would not be "entitled to elements of value arising from the prospect that the government would acquire the" KS site or the land around it, *Olson v. U.S.*, 292 U.S. 246, 261 (1934), or elements "that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable." *Id.* at 258. "The mere allegation of entitlement to the value of an intensive use will not avail the landowner if the project would not have been allowed under other existing, legitimate land-use limitations. When a taking has occurred, under accepted condemnation principles the owner's damages will be based upon the property's fair market value—an inquiry which will turn, in part, on restrictions on use imposed by legitimate zoning or other regulatory limitations." *Palazzolo*, 533 U.S. at 625 (citations omitted). Accordingly, whether the Equinix deal, for example, was an element indicative of a higher fair market value is questionable, since it is unclear whether and to what extent that economic value would have been expected to flow to King Sykes at the time the government committed to including the KS site in its development plan or how reasonable or legitimate the limitations on the KS site were prior to the events giving rise to this case. That is a fact question for whichever body may be tasked with determining just compensation down the road, but this analysis demonstrates why King Sykes' grievance is not properly adjudicated at this stage, prior to the land actually being taken.

For these reasons, King Sykes has failed to assert a viable claim under a regulatory taking theory. None of the *Penn Central* factors support its position, and it has not succeeded in differentiating its attempted constitutional claim from any run-of-the-mill zoning appeal.

### B. Equal Protection and Section 1983 Theories

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall . . . deny to any persons within its jurisdiction the equal protection of laws." U.S. CONST. amend. XIV, § 1. The Clause "prohibits state action that discriminates on the basis of

membership in a protected class or irrationally targets an individual for discriminatory treatment as a so-called 'class of one.'" *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010).

King Sykes asserts that the City Defendants violated its rights under the Clause by discriminatorily refusing to grant it the necessary permits for developing the KS site. It also asserts that all the defendants should also be subject to liability under this class-of-one theory on a conspiracy basis. To prevail, King Sykes "must establish that (1) a state actor has intentionally treated him differently than others similarly situated, and (2) there is no rational basis for the difference in treatment." *Id.* King Sykes proposes GRIT, as the owner of the Michael Reese site, which the City picked as the site for a data center over the KS site, as a similarly situated comparator. Am. Compl. ¶ 95. As for the latter aspect, King Sykes argues that "here the alleged unequal treatment as to Plaintiff's property goes beyond . . . just favor[ing] one data center site over another. Alderwoman King said she would not approve *any* use for the KS Site, which made the site worthless. There is no rational basis for the City to bar *any* use of the land and to withhold approvals for *any purpose* indefinitely." Resp. at 21. The Court reiterates that the alleged any-future-development "bar" was not a final decision, and therefore cannot be used as a basis for a constitutional claim. The focus is on the City's rejection of the data center proposal.[12]

"It is the well established law of this Circuit that, '[a]bsent a fundamental right or a suspect class, to demonstrate a viable equal protection claim in the land use context, a plaintiff must demonstrate governmental action wholly impossible to relate to legitimate governmental objectives.'" *Civ. Liberties for Urb. Believers v. City of Chicago*, 342 F.3d 752, 766 (7th Cir. 2003) (quoting *Forseth v. Village of Sussex,* 199 F.3d 363, 370-71 (7th Cir. 2000)) (alteration in original). Because King Sykes' complaint fails to "negative any reasonably conceivable state of facts that

---

[12] Even still, it is not a given that that supposed decision would fail rational-basis review.

27

could provide a rational basis for the classification," *Scherr v. City of Chicago*, 757 F.3d 593, 598 (7th Cir. 2014) (quoting *Lauth v. McCollum,* 424 F.3d 631, 634 (7th Cir. 2005)), it does not plausibly allege an equal protection violation. The Court need not search far for a rational basis; as the City points out, Reply at 11-12, King Sykes' own complaint supplies one: The City has a redevelopment plan for the area, and part of its calculus for making that plan successful includes having a data center on the Michael Reese site, not on the KS site. "In general, zoning ordinances imposing restrictions on use and occupation of private land, including distinguishing between residential and commercial and other uses, satisfy the rational basis test." *Maum Meditation H. of Truth v. Lake Cnty., Illinois*, 55 F. Supp. 3d 1081, 1089 (N.D. Ill. 2014); *see also Civ. Liberties for Urb. Believers*, 342 F.3d at 767 (acknowledging that "regulating land use within its city limits" is a legitimate interest for the City of Chicago). The City's plan to redevelop the area in collaboration with the Developer Defendants is legitimate, and eventually using the KS site as the logistical staging area for the McCormick Center while the Marshaling Yard is put to another use is rationally connected to that objective. To reach this conclusion, the Court need not reject King Sykes' characterization of the City's motives as "further[ing] the City's own entrepreneurial endeavors." Resp. at 21 n.9, ECF No. 55. It is reasonable for the City to consider impacts on its revenues in making land-use decisions. As discussed above, if and when the City's conduct arises to the level of a taking, then King Sykes can seek just compensation. But the equal protection framework King Sykes seeks to invoke is a poor fit for the facts alleged in the complaint.

King Sykes has failed to state a ripe and plausible constitutional violation. Therefore, the Court does not need to reach the defendants various other challenges regarding *Monell* liability, the existence of a conspiracy to violate King Sykes' constitutional rights, or the improper "lumping" together of the Developer Defendants.

### C.  Dismissal Without Prejudice

The complaint is dismissed without prejudice because it is being dismissed in part on jurisdictional grounds, *see Frederiksen v. City of Lockport*, 384 F.3d 437, 438-39 (7th Cir. 2004); *T.W. by Enk v. Brophy,* 124 F.3d 893, 898 (7th Cir. 1997), and because King Sykes has not yet been given the opportunity to cure the deficiencies identified in this opinion. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and N.W. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily . . . a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. We have said this repeatedly."). It is not certain that any such attempt to cure would be futile. *Id.* ("Amendment should be refused only if it appears to a certainty that plaintiff cannot state a claim. The better practice is to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the court will be able to determine conclusively on the face of a defective pleading whether plaintiff actually can state a claim." (quoting *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Commn.*, 377 F.3d 682, 687 (7th Cir. 2004)). Nevertheless, the deficiencies identified by this Order—in addition to some of those asserted by the defendants that the Court ultimately did not need to reach—are deeply embedded in King Sykes' complaint. King Sykes faces a significant hurdle in overcoming those defects if it chooses to file another amended complaint.

The complaint asserts supplemental state-law causes of action against the Developer Defendants that should also be dismissed without prejudice. "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) ("As a general matter, when all federal claims have been dismissed prior to trial, the federal court should

29

relinquish jurisdiction over the remaining pendent state claims."). This case does not raise any of the issues that justify a departure from that general practice. *See Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251 (7th Cir. 1994) (holding that there are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point to a federal decision of the state-law claims on the merits," including when the statute of limitations has run on the pendent claim, when substantial judicial resources have been expended on a case, and when the pendent claims are "patently frivolous" or obviously lacking in merit.).

* * *

For the foregoing reasons, King Sykes' complaint is dismissed for lack of subject matter jurisdiction to the extent that its federal claims are not ripe, for failure to state a claim under federal law to the extent that its federal claims are ripe, and as matter of discretion to the extent its claims invoke state law. King Sykes has leave to amend by March 29, 2024.

Dated: February 22, 2024

John J. Tharp, Jr.
United States District Judge